**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **KENDALL HOLDINGS, LTD., d/b/a** | : | |
| **PHPK Technologies,** | | |
| | : | **Case No. 2:08-cv-390** |
| **Plaintiff,** | | |
| | : | **Judge Holschuh** |
| **v.** | | |
| | : | **Magistrate Judge Kemp** |
| **EDEN CRYOGENICS LLC, et al.,** | | |
| | : | |
| **Defendants.** | | |
| | : | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kendall Holdings, Ltd., d/b/a PHPK Technologies ("Plaintiff") brought this suit against Defendants Eden Cryogenics LLC ("Eden"), Eden's founder and President Steven L. Hensley ("Hensley"), an Eden employee named Jim Mitchell ("Mitchell") and one or more John Doe defendants, to remedy Eden's alleged copyright infringement and misappropriation of trade secrets, among other claims. This matter is before the Court on Plaintiff's Motion for Temporary Restraining Order (doc. # 15), which asks the Court to enjoin Defendants from:

1) selling, advertising, or producing any product derived through the use of any of [Plaintiff's] confidential and proprietary information, including, but not limited to shop drawings, pricing information and customer lists in violation of Ohio Revised Code § 1333.61, *et seq.*;

2) reproducing [Plaintiff's] copyrighted catalog and any part thereof, including, but not limited to, the format, substance, structure, sequence, shop drawings, products, tables, charts, data, or language thereof, in any form in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.*; and

3) distributing or displaying copies or reproductions of any aspect of [Plaintiff's] copyrighted catalog, including, but not limited to, reproductions of the format, substance, structure, sequence, shop drawings, products, tables, charts, data or language thereof, in any form in violation of the Copyright Act, 17 U.S.C. § 101, *et seq.*

(p. 1, doc. # 15.)  For the following reasons, Plaintiff's Motion is **DENIED**.

## I.    Background

This case involves the cryogenics industry, which is a sophisticated, tightly-knit, relatively small industry that utilizes extremely low-temperature substances (such as liquid oxygen, nitrogen, and helium) and high-vacuum conditions.  (Def. Resp. p. 3-4, doc. # 26.)  Cryogenics companies such as the parties to this case manufacture and supply items, such as valves, bayonets,[1] and vacuum-insulated piping, for use in the industrial gas, automotive, military, aerospace, medical, and semiconductor industries.  (Pl. Mot. T.R.O. p. 3, doc. # 15.)  There are only approximately 200 to 300 private companies and government entities that use these types of cryogenic products, and competitors in the industry generally know who their potential customers are.  (Def. Resp. p. 16-17, doc. # 26.)  Additionally, Defendants assert that many of the products that the industry competitors produce are standardized and substantially similar across the industry.  (Def. Resp. p. 14, doc. # 26; Hensley Aff. ¶ 3, doc. # 26-2.)

Hensley began his career in the cryogenics industry in 1967 with CVI, Inc. ("CVI"), a cryogenics company founded by James Pierce ("Pierce").  Hensley asserts that "CVI was a leader in the cryogenics industry, and many of the products and innovations created by CVI form the basis for the standardized cryogenics products sold today."  (Hensley Aff. ¶ 3, doc. # 26-2.)  While at CVI, Hensley designed CVI's standardized products, including valves, bayonets, and piping, and eventually became CVI's Vice President of Standard Products.  (Id. ¶ 5.)  Hensley also states that he was the primary author of CVI's product catalog.  (Id. ¶ 6.)  CVI hired Mitchell in 1988, but

---

[1] A "bayonet," in the cryogenics industry, is a device used to connect two sections of vacuum-insulated piping.

Mitchell left CVI in 1989 to pursue a career as a firefighter. CVI hired Mitchell as an independent contractor in 1991, however, and Mitchell drafted "shop drawings," design and engineering drawings that contain detailed information about a company's products, for CVI's standard products, including valves, bayonets, and piping. (Mitchell Aff. ¶ 2-3, doc. # 26-3.)

Pierce, CVI's founder, retired from CVI in 1991 and founded PHPK Technologies, Inc. (referred to by the parties as "Old PHPK"). Old PHPK initially did not manufacture cryogenic products, but instead operated as an engineering consulting firm. (Hensley Aff. ¶ 8, doc. # 26-2.) Hensley and Mitchell remained at CVI, which was acquired by Chart Industries, Inc. in 1994. In 1995, however, Old PHPK decided to move into manufacturing cryogenic products and hired Hensley to create a standard product line. (Id. ¶ 9.) Old PHPK then hired Mitchell as an independent contractor in April 1995, and Mitchell states that he was the "primary designer of Old PHPK's standard product line, which consisted of products such as cryogenic valves, bayonets . . . and piping." (Mitchell Aff. ¶ 10, doc. # 26-3.) Hensley and Mitchell created Old PHPK's standard product line using their knowledge of the cryogenics industry, as well as their experience and designs from CVI. Hensley and Mitchell also helped to develop Old PHPK's product catalog, with Hensley stating that he was the primary author and Mitchell stating that he created many of the drawings that were included in the catalog. (Id. ¶ 12; Hensley Aff. ¶ 13, doc. # 26-2.) Old PHPK also developed customer lists and pricing information for its products that it did not disclose to the public and attempted to keep secret. (Pl. Mot. T.R.O. p. 4, doc. # 15.)

Mitchell left Old PHPK in 1999, and acknowledges that he took approximately 200 Old PHPK shop drawings that he had created when he left. Mitchell asserts that it is customary in the cryogenics engineering industry for engineers and independent contractors to take their designs and

shop drawings with them when they switched employers or left employment, and that Old PHPK never informed him of any limited-access policy with regards to the shop drawings or indicated to him that he could not take these drawings when he left Old PHPK.  (Mitchell Aff. ¶¶ 6, 11, 13.) Hensley similarly states that Old PHPK had no policies related to limiting access to shop drawings, and did not require employees to return shop drawings when leaving employment.  Hensley also states that it is common in the industry for engineers to retain these drawings and designs for reference and assistance with future designs.  (Hensley Aff. ¶¶ 11, 14, 21.)  Plaintiff vigorously disputes these assertions, and states that Old PHPK granted access to the shop drawings to only a select group of employees, kept the shop drawings protected in electronic format, stamped all shop drawings as proprietary and confidential, and in no way allowed employees to take these drawings and designs with them when they left employment.  (Pl. Reply p. 12-14, doc. # 29; Kreinbrink Aff. ¶¶ 8-14, doc. # 29-3.)  Mitchell returned to CVI/Chart upon leaving Old PHPK.  (Mitchell Aff. ¶ 14, doc. # 26-3.)

Hensley remained at Old PHPK and eventually became Old PHPK's President and General Manager.  However, he resigned in January 2004 and began looking for a business partner to purchase Old PHPK's assets and continue the operation.  (Def. Resp. p. 4, doc. # 26.)  He eventually met with Richard Coleman, Kendall Holdings, Ltd.'s C.E.O., who agreed to purchase Old PHPK. In March 2004, Kendall Holdings, Ltd. purchased all of Old PHPK's assets, including Old PHPK's shop drawings, designs, catalog, customer lists, and pricing information, from Pierce and became Plaintiff Kendall Holdings, Ltd. d/b/a PHPK Technologies, an entity that the parties refer to as "New PHPK."  (Coleman Aff. ¶ 5, 6, doc. # 15-2.)  Although the Asset Purchase Agreement and Bill of Sale indicate that Kendall Holdings Ltd. also purchased CVI's intellectual property and that Old

PHPK warranted it had the authority to sell CVI's intellectual property (Pl. Reply p. 15, doc. # 29), it is not clear from the record how, exactly, Old PHPK had this authority, as CVI apparently continued to operate as an independent company after Pierce left to create Old PHPK and CVI was later acquired by a different company.

New PHPK retained Hensley as President, and he continued in the same role that he had at Old PHPK. New PHPK used Old PHPK's shop drawings and designs, and also used Old PHPK's product catalog that Hensley states he authored. New PHPK later hired Mitchell as an independent contractor. While with New PHPK, Mitchell again created designs and shop drawings for New PHPK standard products, but instead of the valve, bayonets, and piping that he had worked on previously, Mitchell now primarily designed cryopumps. (Mitchell Aff. ¶ 16, 17, doc. # 26-3.) New PHPK terminated Hensley in November 2004, however, and Mitchell left New PHPK shortly thereafter. (Def. Resp. p. 4, doc. # 26.) Hensley states that he took personal reference material with him when he left New PHPK, and he and Mitchell reiterate that New PHPK, like Old PHPK, had no policies regarding limited access to shop drawings or required employees to return such documents when leaving employment. (Id. p. 6.) Again, Plaintiff vigorously disputes these assertions.

After leaving New PHPK, Hensley was unemployed for a period and then worked as a consultant in the cryogenics industry before co-founding a new cryogenics company, Brehon Cryogenics, LLC, in January 2006. This company became Defendant Eden Cryogenics LLC. (Id. p. 5.) Eden designs and manufactures cryogenic equipment such as valves, bayonets, and piping, and is in direct competition with New PHPK. (Id.) Hensley hired Mitchell to help design Eden's standard product line, and Mitchell states that when designing these products he referred to his

5

experience in the industry and the designs he created while at CVI and Old PHPK.  (Mitchell Aff. ¶ 20, doc. # 26-3.)  Hensley, with Mitchell's assistance, also designed Eden's product catalog.

In late 2007, Plaintiff asserts that it began to notice that "some of its long-standing customers were purchasing from Eden and that Eden was underbidding New PHPK on projects."  (Pl. Mot. T.R.O. p. 4, doc. # 15.)  Plaintiff began an investigation, and concluded that Hensley and Mitchell had improperly acquired shop drawings, customer lists, and pricing information, and were using that information to build Defendants' business.  Plaintiff also concluded that Defendants had copied New PHPK's copyrighted product catalog.  Plaintiff sent a cease and desist letter to Defendants in late February 2008 outlining Plaintiff's allegations and demanding that Defendants halt all infringing conduct.  (Pl. Reply p. 6, doc. # 29.)  Defendants responded shortly thereafter, and promised that an investigation would be completed by April 11, 2008.  Plaintiff, however, was not satisfied with this response, and in early March Plaintiff sent a letter to numerous actual and prospective Eden customers, detailing Plaintiff's claims against Defendants and warning them not to purchase cryogenic products from Eden.  (Def. Resp. p. 2 n.1, doc. # 26.)  This letter is the subject of a counterclaim for defamation and tortious interference with business relationships by Defendants. (Answer and Counterclaim p. 10-11, doc. # 27.)  Counsel for Plaintiff and Defendants met at least twice in March to attempt to settle their dispute informally, but Plaintiff was not satisfied with the outcome of these discussions and filed its Complaint on April 24, 2008 alleging federal copyright infringement, misappropriation of trade secrets in violation of Ohio law, and other state law claims. (doc. # 2.)

Plaintiff states that it continued to attempt to resolve this case informally by making a settlement demand on Defendants on April 29, 2008 and requesting a response by May 2, 2008.  (Pl.

6

Reply p. 7, doc. # 29.) However, Plaintiff states that it did not hear from Defendants and thus requested an initial T.R.O. conference, pursuant to S.D. Ohio Civ. R. 65.1 with Judge Marbley, the district judge previously assigned to this case. The docket indicates, however, that Plaintiff's Motion for Temporary Restraining Order was not filed until May 15, 2008, when the initial T.R.O. hearing was set to be held. (doc. # 15.) On that date this case was transferred to the undersigned due to Judge Marbley's unavailability. This Court set the initial Rule 65.1 conference for May 20, 2008, the first available date. At the Rule 65.1 conference, the Court noted that Defendants had not yet filed a response to Plaintiff's Motion, and gave Defendants two weeks in which to prepare a written response. Plaintiff was then given a week to prepare a reply. Defendants have filed their Response (doc. # 26) and Plaintiff has filed its Reply (doc. # 29), and these issues are now ripe for adjudication. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367(a).

## II.      Applicable Legal Standard Governing Temporary Restraining Orders

A temporary restraining order is an extraordinary remedy that should only be granted if the movant can clearly show the need for one. See, e.g., First Tech. Safety Sys., Inc. v. Depinet, 11 F.3d 641, 650 (6th Cir. 1993). The Court must address four factors when determining whether to grant a temporary restraining order: "(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of [an injunction] would cause substantial harm to others; and (4) whether the public interest would be served by issuance of [an injunction]." Leary v. Daeschner, 228 F.3d 729, 736 (6th Cir. 2000) (quoting McPherson v. Michigan High Sch. Athletic Ass'n., 119 F.3d 453, 459 (6th Cir. 1997) (en banc)). These are factors that must be balanced against one another.

## III.      Analysis

7

A.      **Likelihood of Success on the Merits**

1.      **Misappropriation of Trade Secrets**

Ohio's Uniform Trade Secrets Act allows a court to enjoin "actual or threatened" misappropriation of a trade secret.  OHIO REV. CODE ANN. § 1333.62(A) (LexisNexis 2006).  A "trade secret" is:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1)      It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2)      It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C. § 1333.61(D).  When determining if a trade secret exists, courts look to (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.  Penetone Corp. v. Palchem, Inc., 627 F.Supp. 997, 1005 (N.D. Ohio 1985).

"Misappropriation" is defined as:

(1)      Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;

8

(2)      Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

        (a)      Used improper means to acquire knowledge of the trade secret;

        (b)      At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

        (c)      Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

R.C. § 1333.61(B).  A widely-cited Northern District of Ohio case states that, to establish a cause of action for misappropriation of trade secrets, a plaintiff must prove by a preponderance of the evidence that 1) a trade secret exists; 2) the trade secret was acquired as a result of a confidential relationship; and 3) the trade secret was acquired as a result of the unauthorized use of the secret. Penetone Corp., 627 F.Supp. at 1005.

Plaintiff argues that its shop drawings, customer lists, and pricing information are trade secrets because they "are not generally known to nor [are] readily ascertainable through proper means by others who can obtain economic value from [their] disclosure" (Pl. Mot. T.R.O. p. 6, doc. # 15), and because Plaintiff undertook reasonable efforts to maintain their secrecy by limiting access to the shop drawings and not disclosing them to outside parties.  (Pl. Reply p. 10-14, doc. # 29.) Plaintiff then argues that Defendants have improperly acquired and used these trade secrets, particularly the shop drawings, to build Eden's business by "stealing" Plaintiff's shop drawings, copying them, and using them to produce identical cryogenic products.  (Pl. Mot. T.R.O. p. 6, doc. # 15.)

To illustrate its claims, Plaintiff focuses on an Eden "female bayonet" that Plaintiff argues is an exact copy of a New PHPK female bayonet.  Plaintiff argues that the two bayonets are "virtually indistinguishable in all material respects," and that "[t]he only way to achieve this level of exact match is for Defendants to have copied the New PHPK [shop] drawing."  (Pl. Reply p. 8, doc. # 29.)  Plaintiff argues that this evidence creates a burden on Defendants to prove that Defendants designed the bayonet by an independent means, and cites decisions from the Seventh and Ninth Circuits, as well as the Southern District of California and the District of Delaware.  (Id. p. 9.) Plaintiff argues that Defendants have not produced any evidence of independent creation, and thus that there is a strong likelihood that Plaintiff will prevail on the merits of its misappropriation claim.

Defendants respond by arguing that there is not a substantial likelihood of success on the merits because Plaintiff's shop drawings, customer lists, and pricing information are not trade secrets.  (Def. Resp. p. 12-17, doc. # 26.)  Defendants argue that Plaintiff has not taken reasonable efforts to maintain the confidentiality of the shop drawings because Plaintiff shares its shop drawings with outside parties, such as manufacturers and customers, and because Plaintiff had no security measures in place to limit access to the drawings or to prevent employees like Hensley and Mitchell from retaining the drawings when they left employment. (Id. p. 14.) Defendants also argue that competitors in the cryogenics industry possess similar drawings of these products, because the products at issue are standardized, non-novel products that are widely used in the industry and thus they do not create an independent economic benefit, and note that Hensley and Mitchell had extensive experience in the cryogenics industry and were well-aware of general product specifications before they came to Old PHPK or New PHPK.  Additionally, Defendants argue that

the specific female bayonet referenced by Plaintiff, as well as all of the products depicted in the shop drawings, could easily have been reverse-engineered,[2] and that this indicates that the shop drawings are not trade secrets.  (Id. p. 15-16.)  Defendants go on to argue that the customer list is not a trade secret because the number of cryogenics products customers is small and is widely known to all competitors in the industry, and that the pricing information is not a trade secret because New PHPK's 2004 pricing structure would be different than the current pricing structure.  Furthermore, Defendants note that Eden has been underbid by New PHPK multiple times, which indicates that Eden does not have access to New PHPK's current prices.  (Id. p. 17.)

The Court finds that Plaintiff has not established a strong or substantial likelihood of success on the merits of its misappropriation claim.  There is a genuine question as to whether the customer list can be considered a trade secret in light of the evidence that Hensley had extensive experience in the cryogenics industry and knew all the potential customers.  Even if Hensley did not have this knowledge, Defendants have presented evidence that the cryogenics industry is small and that competitors generally know who potential customers may be by attending trade shows and conferences. (Def. Resp. p. 17.)  See Hildreth Mfg., L.L.C. v. Semco, Inc. 151 Ohio App. 3d 693, 707-8, 785 N.E.2d 774 (3rd Dist. 2003).  Similarly, Defendants have presented evidence that New PHPK has underbid Eden for projects, and that the last New PHPK pricing information that Hensley and Mitchell would have had access to would have been the 2004 pricing information.  Plaintiff does not address these arguments in its Reply, and the Court concludes that Plaintiff has not clearly

---

[2] "Reverse engineering" refers to the process of discovering the technological principles of a device or product through an analysis of its structure, function and operation.  The goal of reverse engineering is to determine the method by which the product was developed which allows a company or person to then produce their own version of the product.  See e.g., Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 182, 707 N.E.2d 853 (1999).

established that this information is a trade secret.  Because it is not clear that the customer list and pricing information are trade secrets under R.C. § 1333.61(D), there is no way to conclude that Plaintiff has established a "strong" likelihood of success on the merits of a claim for misappropriation of the customer list and pricing information.

The Court also finds that Plaintiff has not established a strong likelihood of success on the merits of a claim for misappropriation of the shop drawings.  First, the parties vigorously dispute whether New and Old PHPK took reasonable efforts to protect the secrecy and confidentiality of the shop drawings, a requirement under R.C. § 1333.61(D)(2).  Each party presents credible affidavit testimony in support of their positions, but the Court cannot resolve this dispute on affidavit testimony alone, at least not to the degree required for Plaintiff to succeed on its Motion.  Whether New PHPK in fact had security policies in place to limit access to the shop drawings or disclosed the shop drawings to outside parties is a question of fact that the Court cannot resolve at this time, see Fred Siegel Co., L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 707 N.E.2d 853 (1999) and raises a question as to whether the shop drawings constitute "trade secrets" under R.C. § 1333(D).

Second, it is not clear that the shop drawings, and the products that they represent, create independent economic benefit to Plaintiff by not being known or disclosed to other cryogenics competitors under R.C. § 1333.61(D)(1).  Plaintiff has not presented any evidence of the unique nature of the female bayonet, for instance, that would allow the Court to conclude that its novelty or uniqueness gives Plaintiff an independent benefit over its competitors by not revealing the bayonet's design.  See R & R Plastics, Inc. v. F. E. Myers Co., 92 Ohio App. 3d 789, 800-2, 637 N.E.2d 332 (6th Dist. 1993) ("[T]he uniqueness and novelty of the alleged trade secret has often been examined by Ohio courts in analyzing misappropriation claims" because such characteristics

12

go to the question of whether the information was known outside the business).  Defendants have argued that the bayonet specifically, and the products represented in the shop drawings generally, were standardized, non-novel products widely produced by cryogenics manufacturers (Def. Resp. p. 14-15, doc. # 26), and that Hensley's and Mitchell's long experience in the cryogenics industry would have allowed them to design this bayonet without reference to Plaintiff's shop drawings. There is a question as to whether such a widely known industry product, and the shop drawing detailing its specifications, would qualify as a trade secret under Ohio law because it would not appear to give Plaintiff a competitive advantage in the cryogenics product marketplace.  See Dexxon Digital Storage, Inc. v. Haenszel, 161 Ohio App. 3d 747, 753, 832 N.E.2d 62 (5th Dist. 2005) ("To constitute a trade secret, the information must be both unique and competitively advantageous. Trade secrets are generally thought of as things that give an employer a competitive advantage over another . . . "); Hildreth Mfg., L.L.C., 151 Ohio App. 3d at 706 (Where defendant's product and manufacturing process was widely known in and available to the industry, and where founder of allegedly misappropriating company had extensive experience in the industry before his association with the defendant, product and manufacturing process were not trade secrets).  Hensley and Mitchell have also asserted that Plaintiff's products, and the bayonet specifically, could easily be reproduced through reverse engineering, which further undercuts Plaintiff's claim that the bayonet and accompanying shop drawing are trade secrets.  See Valco Cincinnati, Inc. v. N & D Machining Service, Inc., 24 Ohio St. 3d 41, 45, 492 N.E.2d 814 (1986) (Reverse engineering is a proper means of obtaining product information and negates the existence of a trade secret).  Plaintiff has not been able to make a strong showing that the shop drawings are trade secrets, and thus cannot establish a strong likelihood of success on the merits of this claim.

Plaintiff's argument that Defendants bear a burden to demonstrate independent creation is unpersuasive.  As an initial matter, Plaintiff cites no Sixth Circuit or Ohio law for the proposition that disclosure of a trade secret, followed by manufacture of a similar device, imposes a burden on Defendants to demonstrate independent creation (Pl. Reply p. 9, doc. #29), nor can the Court find support for this proposition under Ohio law.  Even if Ohio courts adopted this presumption, however, Hensley's and Mitchell's statements that Plaintiff's products could easily be reverse engineered would help to establish a genuine issue as to whether Defendants actually used Plaintiff's shop drawings to create its products.  The fact that there would be a genuine dispute as to this issue would mean that, again, Plaintiff could not establish a strong likelihood of success on the merits.

The Court, of course, is not deciding the merits of Plaintiff's misappropriation claim, and does not express an opinion as to whether Plaintiff will ultimately prevail on the merits of this claim. The Court is simply concluding that Plaintiff has not established a "strong" or "substantial" likelihood of success on this claim, as would be required to help justify the extraordinary remedy of issuing a temporary restraining order, because legitimate questions exist as to whether Plaintiff's shop drawings, customer list, and pricing information constitute trade secrets.  Because the Court resolves Plaintiff's Motion on the grounds of whether Plaintiff's information constitutes trade secrets, the Court expresses no opinion on the issue of whether Defendants have misappropriated Plaintiff's information.

### 2.    Copyright Infringement

"Liability for direct [copyright] infringement arises from the violation of any one of the exclusive rights of a copyright owner.  The owner of [a] copyright . . . has the exclusive right to, and to authorize others to, reproduce, distribute, perform, display, and prepare derivative works from the

copyrighted [work]." NCR Corp. v. Korala Assocs., Ltd., 512 F.3d 807, 814 (6th Cir. 2008). "To qualify for copyright protection, a work must be original to the author. . . . Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possess at least some minimal degree of creativity." Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345 (1991). Originality is the touchstone of modern copyright law, and is a constitutional requirement. The originality requirement is not a stringent test, however, as "the requisite level of creativity is extremely low; even a slight amount will suffice." Id. Raw facts are not copyrightable, but choices relating to the selection and arrangement of facts in a compilation are copyrightable "so long as [these choices] are made independently by the compiler and entail a minimum degree of creativity . . . ." Id. at 348.

To establish a cause of action for copyright infringement, the plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Id. at 361; see also Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir. 1999). Direct evidence of copying is rare, so plaintiffs in copyright infringement cases frequently attempt to establish an inference of copying by showing "(1) access to the allegedly-infringed work by the defendant [] and (2) a substantial similarity between the two works at issue." Kohus v. Mariol, 328 F.3d 848, 853-54 (6th Cir. 2003). The "substantial similarity" factor is further broken down into another two part test: first, the court must determine which portions of the original work are truly original and protected by copyright law; and second, "the trier of fact [must] evaluate similarity from the viewpoint of the ordinary observer." Id. at 854.

Plaintiff argues that it owns a valid copyright in its catalog, and then points to numerous instances in which, Plaintiff argues, Defendants have copied passages verbatim from Plaintiff's

15

catalog and inserted them into Defendants' catalog.  Plaintiff also argues that the overall layout and arrangement of Defendants' catalog duplicates Plaintiff's catalog.  (Pl. Mot. T.R.O. p. 8-10, doc. # 15.)  Plaintiff argues that this proves direct copying, but argues in the alternative that it can establish an inference of copying.  As former employees of Old PHPK and New PHPK who helped to create Plaintiff's catalog, Plaintiff argues that Hensley and Mitchell clearly had access to Plaintiff's catalog, and that the two catalogs are substantially similar when examined from the viewpoint of the ordinary observer.  (Id. at 10.)

Defendants counter by arguing first that Plaintiff's catalog is not copyrightable because it consists of factual statements and visual depictions that have no element of originality.  (Def. Resp. p. 9, doc. # 26.)  Alternatively, Defendants argue that there is no infringement in this case because Plaintiff's catalog is not original.  Defendants state that numerous other companies in the cryogenics industry publish catalogs, and that they all contain similar arrangements and content because the different companies all produce similar products and use similar language, familiar to customers, to describe their products and manufacturing processes.  (Id. at p. 10-11.)  Defendants also argue that, due to Mitchell's work creating Plaintiff's catalog while he worked as an independent contractor for Old PHPK, Mitchell is a joint author of Plaintiff's catalog and thus cannot infringe on his own copyright.  (Def. Resp. p. 11-12, doc. # 26.)  Plaintiff replies by arguing that Mitchell's contributions to Old PHPK's catalog do not rise to the level of joint authorship.  (Pl. Reply p. 17-18, doc. # 29.)

The Court concludes that Plaintiff has established a strong likelihood of success on the merits of its copyright infringement claim.  Although Defendants are correct that some parts of Plaintiff's catalog deal with technical facts and specifications that are not subject to copyright protection, those

facts are selected and arranged in a manner that reveals the requisite degree of originality.  See Feist
Publications, 499 U.S. at 348 (selection and arrangement of facts is copyrightable when original).
Defendants' arguments concerning other companies' catalogs are unpersuasive for two reasons: first,
Defendants have not submitted those other catalogs for consideration, so there is no way to tell if
the arrangements of facts are similar and commonly used; and second, Feist Publications makes it
clear that "[o]riginality does not signify novelty; a work may be original even though it closely
resembles other works so long as the similarity is fortuitous, not the result of copying."  499 U.S.
at 345.  The remainder of Plaintiff's catalog contains copyrightable descriptions of Plaintiff's
business and services.  (See New PHPK Catalog, Pl. Mot. T.R.O. ex. O, doc. # 15-17.)

Plaintiff has also shown a substantial similarity between its catalog and Defendants'.  The
headings and subheadings of the different sections in the two catalogs are virtually identical, and the
majority of the text within those subsections is also identical in all but a few instances.  (Compare
id. with Eden Catalog, Pl. Mot. T.R.O. ex. N, doc. # 15-16.)  A reasonable observer could easily
conclude that Defendants' catalog is substantially similar to, if not identical to, the original portions
of Plaintiff's catalog.  There is a strong likelihood that Plaintiff will be able to establish an inference
of copying, because the catalogs are substantially similar and Hensley and Mitchell clearly had
access to Plaintiff's catalog.  See Kohus, 328 F.3d at 853-54.

Defendants' arguments concerning joint authorship do not alter this result.  Defendants bear
the burden of establishing joint authorship because Plaintiff's certificate of copyright registration
indicates that Plaintiff is the sole author of the catalog.  See Hi-Tech Video Productions, Inc. v.
Capital Cities/ABC, Inc., 58 F.3d 1093, 1095 (6th Cir. 1995).  Mitchell avers that he created many
of the drawings that were included in Plaintiff's catalog, and assisted in the production of some of

17

the charts. (Mitchell Aff. ¶ 12, Def. Resp. ex. B, doc. # 26-3.) However, authorship requires more than merely contributing some ideas or sketches to a project; an individual must substantially contribute to the actual creation of the copyrighted work to be considered a joint author. See BancTraining Video Systems v. First American Corp., 956 F.2d 268 (Table), 1992 WL 42345, *3 (6th Cir. 1992). Mitchell's vague statements about contributing drawings and charts does not rebut the presumption created by Plaintiff's certificate of registration.

The Court, of course, is not holding that Defendants have actually infringed on Plaintiff's copyright. That is not the Court's task at this moment. The Court is merely concluding that Plaintiff has established a strong likelihood that it will succeed on the merits of its copyright infringement claim for the purposes of a motion for a temporary restraining order.

### B.     Irreparable Harm

Although the different factors that courts consider when ruling on motions for temporary restraining orders must be balanced against each other, the Sixth Circuit has recognized that showing irreparable injury is generally required to warrant injunctive relief. See Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 105 (6th Cir.1982) ("A district court abuses its discretion when it grants [an injunction] without making specific findings of irreparable injury to the party seeking the injunction"); Patio Enclosures, Inc. v. Herbst, 39 F.App'x. 964, 967 (6th Cir. 2002). "Irreparable harm" is "a harm that a court would be unable to remedy even if the movant would prevail in the final adjudication," 13 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 65.06[2] at 65-22 (3d ed. 2008), such as a harm that could not be compensated by calculable money damages. Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 2002). The length of time that a party takes to file suit or request injunctive relief is also relevant to the irreparable harm inquiry.

18

See Forry v. Neundorfer, Inc., 837 F.2d 259, 267 (6th Cir. 1988); MOORE'S § 65.22[1][b].  A delay between the discovery of the allegedly infringing conduct and the request for injunctive relief can support an inference that the alleged harm is not sufficiently severe or irreparable to justify injunctive relief.  Id.

Plaintiff argues that irreparable harm is presumed in misappropriation of trade secrets and copyright infringement cases, and further argues that Defendants' alleged conduct threatens "the very essence of [Plaintiff's] business and success."  (Pl. Mot. T.R.O. p. 11, doc. # 15.)  Defendants counter by noting that Plaintiff waited almost six months after it initially discovered Defendants' allegedly infringing conduct before requesting a temporary restraining order, and argue that this delay indicates that there is no threat of imminent, irreparable injury to Plaintiff.  (Def. Resp. p. 17-19, doc. # 26.)  Plaintiff replies by arguing that this delay was the result of efforts to settle this dispute extrajudicially.  (Pl. Reply p. 6-7, doc. # 29.)

Plaintiff is correct that "[t]he loss of trade secrets is usually considered an irreparable harm [that] cannot be measured in money damages. . . .  Therefore, *where it is shown* that the defendant has misappropriated the plaintiff's trade secrets," irreparable harm is generally presumed.  Deutsche Investment Mgm't. Americas, Inc. v. Riverpoint Capital Mgm't. Inc., No. 1:02-cv-577, 2002 U.S. Dist. Lexis 16147, *18 (S.D. Ohio Aug. 22, 2002) (emphasis added); Avery Dennison Corp. v. Kitsonas, 118 F.Supp.2d 848, 855 (S.D. Ohio 2000).  This presumption does not help Plaintiff in this case, however, because as the Court has previously held, Plaintiff has not established a strong likelihood of success on the merits of its misappropriation of trade secrets claim.  Because it has not been shown that Defendants misappropriated Plaintiff's trade secrets, irreparable harm cannot be presumed.

Plaintiff argues that Defendants' use of its shop drawings, customer list, and pricing information are damaging its competitive market edge, and that it is in danger of losing its business. This argument, however, is undercut by the fact that Plaintiff did in fact delay in filing suit and requesting injunctive relief.  Plaintiff first learned of Defendants' allegedly infringing conduct in December 2007 and began an investigation, and by February 2008 Plaintiff was confident enough in its claims that it sent a cease and desist letter to Defendants.  When this letter did not have the desired effect, however, Plaintiff elected to continue negotiating with Defendants, but not before sending a letter on March 5, 2008 to actual and prospective Eden customers, accusing Defendants of misappropriating Plaintiff's confidential information and copying Plaintiff's catalog.  (Answer and Counterclaim ex. A, doc. # 27-2.)

Defendants argue that a party seeking equitable relief "must come to Court with clean hands" (Def. Resp. p. 2 n. 1, doc. # 26), and the Court agrees that Plaintiff's decision to send this letter to Eden's customers undermines Plaintiff's position.[3]  If the threat to Plaintiff's business was so dire in March, and Plaintiff was so confident in its claims, as to warrant sending a letter to Defendants' customers accusing Defendants of theft, Plaintiff should have requested injunctive relief at that point, as opposed to attempting to take the law into its own hands and potentially damaging Defendants' business and reputation in the cryogenics industry.  Instead, Plaintiff elected to continue to negotiate with Defendant until April 29, when Plaintiff filed its Complaint.  Plaintiff then waited until May 15 to file its Motion.  Although Plaintiff states that it requested a preliminary Local Rule

---

[3] The Court wishes to make clear that, by discussing and relying on Plaintiff's decision to send this letter solely for the purpose of the irreparable harm element of Plaintiff's Motion for Temporary Restraining Order, the Court is not in any way ruling on Defendants' counterclaims for defamation and intentional interference with business relationships that are based on this letter.  The Court expresses no opinion at this time on the merits of Defendants' counterclaims.

65.1 conference with Judge Marbley on May 2, the docket clearly indicates that Plaintiff did not formally request injunctive relief until May 15.  In any event, if the situation was really so pressing, the Motion should have been filed contemporaneously with the Complaint, not used as a litigation tactic to hold over Defendants' heads while making a settlement demand.  The circumstances of this case indicate that Plaintiff delayed in requesting injunctive relief, which indicates that there is no threat of irreparable harm to Plaintiff.

This conclusion is reinforced by Defendants' statements that the shop drawings at issue are not even being used by Defendants.  At the Local Rule 65.1 conference, Defendants' counsel informed the Court that, even when Defendants received Plaintiff's cease and desist letter in February 2008, the shop drawings and other information were not being used by Defendants, and they have definitely not been used since February.  Additionally, Defendants have already returned the majority of the drawings to Plaintiffs.  (TRO Conf. Tr. p. 23, doc. # 30.)  The Court finds that there is no threat of irreparable harm to Plaintiffs with regards to Plaintiff's misappropriation of trade secrets claim.

As for Plaintiff's copyright infringement claim, the Court has found that Plaintiff has established a strong likelihood of success on the merits of this claim, and Plaintiff again is correct that "a plaintiff in a copyright action establishes a rebuttable presumption of irreparable harm by showing that its valid copyright has been infringed." Forry, 837 F.2d at 267; see also Cannon Group Inc. v. Better Bags Inc., No. 2:00-cv-974, 2001 WL 36088544 (S.D. Ohio Sept. 19, 2001).  In this case, however, the Court finds that this presumption of irreparable harm has been rebutted.  The Court's concerns with regards to Plaintiff's delay and the sending of the letter to Defendants' customers, outlined above, apply equally to Plaintiff's copyright infringement claim, and support

an inference that Plaintiff will not be irreparably harmed if the temporary restraining order does not issue. Additionally, Defendants have stated that, as soon as they received Plaintiff's cease and desist letter, they stopped distributing Eden's catalog, are not using it now, do not intend to use it in the future, and are in the process of creating a new catalog. (TRO Conf. Tr. p. 45, doc. # 30.) This makes Plaintiff's Motion essentially moot.

Plaintiff notes that Defendants have not actually replaced the Eden catalog or taken affirmative steps to take it out of the hands of customers or potential customers who may have received the catalog before February. Plaintiff then argues that "[t]o this day, Eden customers are using the Eden catalog, including [Plaintiff's] copyrighted material lifted verbatim from [Plaintiff's] catalog, to contact Eden and submit orders. Accordingly, Defendants are still using the Eden catalog[.]" (Pl. Reply p. 16, doc. # 29.) At the Local Rule 65.1 conference, however, Defendants stated that the majority of Eden's work is bid work that does not implicate the catalog (TRO Conf. Tr. p. 45, doc. # 30), and there is no evidence at this time to support Plaintiff's argument that customers are actually using the Eden catalog. Even if a small number of customers are using the Eden catalog, thanks to Plaintiff's March 5, 2008 letter those customers are well aware of Plaintiff's claim that the Eden catalog infringes on Plaintiff's catalog. Defendants have successfully rebutted the presumption of irreparable harm in copyright infringement actions, and the Court finds that there is no substantial danger of irreparable harm to Plaintiff that would justify the extraordinary remedy of issuing a temporary restraining order.

### C.    Possibility of Substantial Harm to Others

The injunction that Plaintiff requests presents a real possibility of doing substantial harm to Defendants. Plaintiff asks the Court to enjoin Defendants from selling or producing any product

22

derived from Plaintiff's shop drawings, as well as from reproducing, distributing, or displaying copies or reproductions of Plaintiff's catalog.  Plaintiff's request would, essentially, force Defendants out of business, because Plaintiff has not adequately defined the scope of the category of Defendants' products that would be "derived" from Plaintiff's shop drawings.  The Court agrees with Defendants that Plaintiff's requested relief is too broad and vague, and would likely do substantial harm to Defendants.  (Def. Resp. p. 19, doc. # 26.)

###### D.      Impact on the Public Interest

Courts have recognized that Ohio's Uniform Trade Secrets Act embodies a public interest in "maintain[ing] the standards of commercial ethics . . . as well as the protection of the substantial investment of employers in their proprietary information."  ALTA Analytics, Inc. v. Muuss, 75 F.Supp.2d 773, 786 (S.D. Ohio 1999).  This interest is not implicated in this case, however, because Plaintiff has not established a strong likelihood of success on its misappropriation claim.  The public also has an interest in upholding copyright protections and preventing copyright infringement, see Microsoft Corp. v. McGee, 490 F.Supp.2d 874, 883 (S.D. Ohio 2007), but in this case Defendants have stopped distributing and reproducing the allegedly infringing catalog, and issuing a temporary restraining order would not substantially further this interest.  Granting Plaintiff's Motion would not substantially uphold any important public interest.

### IV.      Conclusion

The balance of factors does not support issuing a temporary restraining order on Plaintiff's misappropriation of trade secrets claim.  Plaintiff has not demonstrated a substantial likelihood of success on the merits of this claim, there is no danger of irreparable harm to Plaintiff if the temporary restraining order is not granted, the requested relief will substantially harm Defendants,

and granting the temporary restraining order will not further a public interest.  The balance of factors also does not support granting Plaintiff's Motion with respect to the copyright infringement claim, because although Plaintiff has demonstrated a substantial likelihood of success on the merits, there is no real danger of irreparable harm to Plaintiff because Defendant has already ceased its allegedly infringing conduct and Plaintiff's Motion is essentially moot.  Additionally, the public interest would not be substantially furthered by issuing a temporary restraining order.  For these reasons, Plaintiff's Motion for Temporary Restraining Order (doc. # 15) is **DENIED**.

**IT IS SO ORDERED**.

Date: June 20, 2008                                                        **/s/ John D. Holschuh**
                                                                           John D. Holschuh, Judge
                                                                           United States District Court