UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KENDALL HOLDINGS, LTD., d/b/a
PHPK TECHNOLOGIES,

                    Plaintiff,                    Case No. 2:08-cv-390
                                                 JUDGE EDMUND A. SARGUS, JR.
        v.                                       Magistrate Judge Terence P. Kemp

EDEN CRYOGENICS LLC, et al.,

                    Defendants.


## OPINION AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc.

148), Plaintiff's Motion for Summary Judgment (Doc. 147), and Plaintiff's Motion for Leave to

File Surreply (Doc. 172). For the reasons that follow, the Court **GRANTS IN PART AND**

**DENIES IN PART** both summary judgment motions and **GRANTS** the plaintiff's motion to file

a surreply.

### I. Facts

The plaintiff Kendall Holdings, Ltd., d/b/a PHPK Technologies ("plaintiff" or "PHPK")

brought this suit against the defendants Eden Cryogenics LLC ("Eden"), Eden's founder and

president Steven L. Hensley ("Hensley"), and Jim Mitchell ("Mitchell"), an Eden employee, to

remedy Eden's alleged copyright infringement, misappropriation of trade secrets, deceptive trade

practices, and unfair competition claims. This case involves the cryogenics industry, which is a

sophisticated industry that utilizes extremely low-temperature substances (such as liquid oxygen,

nitrogen, and helium) and high-vacuum conditions. Cryogenics companies, such as the parties to

this case, manufacture and supply items, such as valves, bayonets,[1] and vacuum-insulated piping, for use in the industrial gas, automotive, military, aerospace, medical, and semiconductor industries.

Hensley began his career in the cryogenics industry in 1967 with CVI, Inc. ("CVI"), a cryogenics company founded by James Pierce ("Pierce"). Hensley asserts that CVI was a leader in the cryogenics industry, and many of the products and innovations created by CVI form the basis for the standardized cryogenics products sold today. While at CVI, Hensley designed CVI's standardized products, including valves, bayonets, and piping, and eventually became CVI's Vice President of Standard Products. Hensley was the primary author of CVI's product catalog.

CVI hired Mitchell in 1988. The following year, Mitchell left CVI to pursue a career as a firefighter. CVI hired Mitchell as an independent contractor in 1991 and Mitchell drafted design and engineering drawings for CVI's standard products, including valves, bayonets, and piping. The parties refer to these drawings as "shop drawings." Mitchell continued working at his job as a firefighter while working for CVI.

Pierce, CVI's founder, retired from CVI in 1991 and founded PHPK Technologies, Inc. (referred to by the parties as "Old PHPK"). Old PHPK initially operated as an engineering consulting firm. Hensley and Mitchell remained at CVI, which was acquired by Chart Industries, Inc. in 1994.

In 1995, Old PHPK moved into the business of cryogenic products manufacturing and

---

[1]A "bayonet," in the cryogenics industry, is a device used to connect two sections of vacuum-insulated piping.

hired Hensley to create a standard product line. Old PHPK then hired Mitchell as an independent contractor in April 1995. Hensley and Mitchell created Old PHPK's standard product line using their knowledge of the cryogenics industry, as well as their designs from CVI. Hensley and Mitchell also authored Old PHPK's product catalog. Old PHPK additionally developed customer lists and pricing information for its products.

Mitchell ended his employment with Old PHPK in 1999, and he took with him approximately 2000 Old PHPK shop drawings that he had created. Mitchell asserts that it is customary in the cryogenics engineering industry for engineers and independent contractors to take their designs and shop drawings with them when they change employers or leave employment, and that Old PHPK never informed him of any limited-access policy with regards to the shop drawings or indicated to him that he could not take these drawings when he left Old PHPK. Hensley similarly contends that Old PHPK had no policies related to limiting access to shop drawings, and did not require employees to return shop drawings when leaving employment. Hensley also claims that it is common in the industry for engineers to retain these drawings and designs for reference and assistance with future designs. The plaintiff vigorously disputes these assertions, and contends that Old PHPK granted access to the shop drawings to only a select group of employees, kept the shop drawings protected in electronic format, stamped all shop drawings as proprietary and confidential, and in no way allowed employees to take these drawings and designs with them when they left employment.

Mitchell returned to his employment with CVI/Chart upon leaving Old PHPK. Hensley remained at Old PHPK and eventually became Old PHPK's President and General Manager.

In early 2004, Hensley suggested to Richard Coleman, owner of Kendall Holdings, Ltd.,

that he purchase Old PHPK.  In March 2004, Kendall Holdings, Ltd. purchased all of Old

PHPK's assets, including Old PHPK's shop drawings, designs, catalog, customer lists, and

pricing information, from Pierce and became Kendall Holdings, Ltd. d/b/a PHPK Technologies,

the plaintiff herein.  PHPK retained Hensley as its president, and he continued in the same role

that he had at Old PHPK.  PHPK used Old PHPK's shop drawings and designs, and also used

Old PHPK's product catalog that Hensley authored.  PHPK later hired Mitchell as an

independent contractor.  While with PHPK, Mitchell again created designs and shop drawings for

PHPK standard products, but instead of the valve, bayonets, and piping on which he had

previously worked, Mitchell primarily designed cryopumps.

    PHPK terminated Hensley in November 2004 because Coleman decided to run the

company on his own.  Mitchell left PHPK shortly thereafter.  Hensley states that he took personal

reference material with him when he left PHPK, and he and Mitchell reiterate that PHPK, like

Old PHPK, had no policies regarding limited access to shop drawings or required employees to

return such documents when leaving employment.  Again, the plaintiff vigorously disputes these

assertions.

    After leaving PHPK, Hensley was unemployed for nearly a year and then worked as a

consultant in the cryogenics industry before co-founding a new cryogenics company, Brehon

Cryogenics, LLC, in January 2006.  This company later became defendant Eden Cryogenics

LLC.  Eden designs and manufactures cryogenic equipment such as valves, bayonets, and piping,

and is in direct competition with PHPK.  Hensley hired Mitchell to help design Eden's

standard product line, and Mitchell designed these products by referring to his experience in the

industry and the designs he created while at CVI and Old PHPK.  Hensley, with Mitchell's

4

assistance, also designed Eden's product catalog.

In late 2007, the plaintiff noticed that some of its long-standing customers were purchasing from Eden and that Eden was underbidding PHPK on projects. The plaintiff began an investigation, and concluded that Hensley and Mitchell had improperly acquired shop drawings, customer lists, and pricing information, and were using that information to build Eden's business. The plaintiff also concluded that the defendants had copied PHPK's products catalog.

On February 26, 2008, counsel for the plaintiff sent a cease and desist letter to the defendants outlining the plaintiff's allegations and demanding that the defendants halt all infringing conduct. Two days later, counsel for the defendants responded, indicating that Eden took the allegations very seriously and would conduct a full investigation. Counsel promised to provide a response to PHPK regarding the investigation by April 11, 2008. The plaintiff was not satisfied with this response, and on approximately March 5, 2008, it sent a letter to numerous actual and prospective Eden customers, detailing the plaintiff's claims against the defendants and warning them not to purchase cryogenic products from Eden.

On April 24, 2008, the plaintiff filed the instant action, alleging copyright infringement, misappropriation of trade secrets, deceptive trade practices, unfair competition, breach of fiduciary duty/breach of duty of loyalty, breach of implied contract of confidentiality, conversion, tortious interference with business relationships, and civil conspiracy. The defendants have filed counterclaims for defamation, tortious interference with business relationships, and abuse of process.

On November 14, 2011, the defendants filed Defendants' Motion for Summary

5

Judgment. (Doc. 148.) On December 12, 2011, PHPK filed Plaintiff's Memorandum in

Opposition to Defendants' Motion for Summary Judgment (Doc. 159), and on December 30,

2011, the defendants filed their Reply Brief in Support of their Motion for Summary Judgment

(Doc. 171).

On November 14, 2011, PHPK filed Plaintiffs' Motion for Summary Judgment (Doc.

147), and on December 12, 2011, the defendants filed Defendants' Memorandum in Opposition

to Plaintiff's Motion for Summary Judgment (Doc. 160). The plaintiff filed Plaintiff's Reply in

Support of Motion for Summary Judgment on December 30, 2011.

On January 4, 2012, the plaintiff filed Plaintiff's Motion for Leave to File Surreply (Doc.

172) and attached the proposed surreply as an exhibit to the motion (Doc. 172-1). On January 9,

2012, the defendants filed Defendants' Opposition to the Plaintiff's Motion for Leave to File a

Surreply. (Doc. 173.)

## II. Plaintiff's Motion for Leave to File Surreply

The Local Civil Rules permit the filing of a motion and memorandum in support, a

memorandum in opposition, and a reply memorandum. S.D. Ohio Civ. R. 7.2(a)(1), (2). "No

additional memoranda beyond those enumerated will be permitted except upon leave of court for

good cause shown." S.D. Ohio Civ. R. 7.2(a)(2). Because the defendants make new arguments

in their reply brief in support of their motion for summary judgment, the Court finds good cause

for the plaintiff to file its surreply. *See Tackett v. M&G Polymers USA, LLC*, No. 2:07cv126,

2011 U.S. Dist. LEXIS 30519, at *11-13 (S.D. Ohio Mar. 24, 2011) (granting plaintiffs' motion

for leave to file a surreply to address new arguments, cases, and factual assertions presented in

defendants' summary judgment reply memorandum). Accordingly, the Court **GRANTS**

6

Plaintiff's Motion for Leave to File Surreply.  (Doc. 172.)

### III.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions" of the record which demonstrate "the absence of a genuine issue of material fact." *Id.* at 323.  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56).  "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be more than some metaphysical doubt as to the material facts").  Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

7

## IV. Defendants' Motion for Summary Judgment

The plaintiff alleges claims for copyright infringement under the federal Copyright Act, 17 U.S.C. § 101, *et seq.*; misappropriation of trade secrets pursuant to Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1333.61 *et seq.*; violations of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02 *et seq.*; common law unfair competition; breach of fiduciary duty/duty of loyalty against Hensley; and civil conspiracy.[2] The defendants move for summary judgment on all of the plaintiff's claims.

### A. Copyright Act

"The Constitution establishes Congress's power to create copyrights to 'promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.'" *ATC Distrib. Group, Inc. v. Whatever it Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 705 (6th Cir. 2005) (quoting U.S. Const. art. 1, § 8, cl. 8). The Copyright Act gives copyright owners exclusive rights to reproduce, prepare derivative works from, distribute, and publicly perform or display a copyrighted work, and allows "the legal or beneficial owner of an exclusive right under a copyright . . . to institute an action for any infringement of that particular right." 17 U.S.C. §§ 106, 501(b). "Liability for direct [copyright] infringement arises from the violation of any one of the exclusive rights of a copyright owner. The owner of [a] copyright . . . has the exclusive right to, and to authorize others to, reproduce, distribute, perform, display, and prepare derivative works from the copyrighted [work]." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 814 (6th Cir. 2008).

---

[2]In its memorandum in opposition, the plaintiff voluntarily dismisses its claims for breach of implied contract of confidentiality, conversion, tortious interference, and breach of fiduciary duty/duty of loyalty as to defendant Mitchell.

8

The plaintiff alleges that the Eden catalog infringes upon the copyright PHPK has on its catalog.[3] The defendants argue that they are entitled to summary judgment on the plaintiff's claim filed under the Copyright Act because the PHPK catalog is not copyrightable, and therefore the Eden catalog could not have infringed upon it, and that even if the PHPK catalog is copyrightable, the plaintiff has failed to show that the Eden catalog infringed upon the copyright.

### 1. Copyrightability

"To qualify for copyright protection, a work must be original to the author. . . . Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possess at least some minimal degree of creativity." *Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 345 (1991). Originality is the touchstone of modern copyright law, and is a constitutional requirement. *Id.* at 347. The originality requirement is not stringent, however, as "the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* Raw facts are not copyrightable, but choices relating to the selection and arrangement of facts in a compilation are copyrightable "so long as [these choices] are made independently by the compiler and entail a minimum degree of creativity . . . ." *Id.* at 348.

As to determining copyrightability, the Sixth Circuit has explained:

Copyrightability is often resolved on summary judgment. *See Carol Barnhart, Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir. 1985); *Norris Indus., Inc. v. Int'l Tel. & Tel. Corp.*, 696 F.2d 918 (11th Cir.), *cert. denied*, 464 U.S. 818, 78 L. Ed. 2d 89, 104 S. Ct. 78, 220 U.S.P.Q. (BNA) 385 (1983), because "very often no issues of material fact are in dispute and the only task for the court is to analyze the allegedly

---

[3]The plaintiff also argues that the defendants should be estopped from denying PHPK's catalog is copyrightable. However, because the Court finds that the PHPK catalog is copyrightable, it need not address the plaintiff's estoppel argument.

> copyrightable item in light of applicable copyright law." *Magic Mktg. v. Mailing Servs. of Pittsburgh, Inc.*, 634 F. Supp. 769, 771 (W.D. Pa. 1986).

*Sem-Torq, Inc. v. K Mart Corp.*, 936 F.2d 851, 853 (6th Cir. 1991). In the instant action, there are no issues of material fact in dispute as to whether the PHPK catalog is copyrightable. Therefore, the Court will decide this issue.

Initially, the Court considers the parties' disagreement as to the standard applicable to the copyrightability analysis. The plaintiff argues that the PHPK copyright should enjoy a rebuttable presumption of validity. "A certification of registration 'made before or within five years after first publication of the work shall constitute *prima facie* evidence of the validity of the copyright and of the facts stated in the certification.'" *Sem-Torq, Inc.*, 936 F.2d at 853-54 (quoting 17 U.S.C. § 410(c)). "The evidentiary weight accorded a certificate registered more than five years after the first publication 'shall be within the discretion of the court.'" *Id.* (quoting 17 U.S.C. § 410(c)). Here, there is no dispute that PHPK registered the copyright approximately 11 years after the catalog was first published. Because of the significant time between the first publication and the registration of the copyright, the Court finds that the certificate of registration of the PHPK copyright shall not constitute *prima facie* evidence of the validity of the copyright and the burden, therefore, is on the plaintiff to show that the PHPK catalog was copyrightable.

As to that inquiry, the defendants argue that the PHPK catalog is not copyrightable because it is a copy or a derivative of the CVI catalog and because the material contained in the PHPK catalog is not the type of material that is subject to being copyrighted. The defendants rely on *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, a case in which the Sixth Circuit evaluated the copyrightability of an automobile parts magazine. 402 F.3d 700

10

(6th Cir. 2005). In that case, the appellate court found that the "copied aspects of the catalog [were] ineligible for copyright protection" because portions of it were "almost identical to the McCarty catalog on which it was based" and lacked sufficient creativity to warrant protection. *Id.* at 711. The defendants argue that, like the catalog in *Whatever it Takes*, the "layout and substance" of the PHPK catalog "mirrors" the CVI catalog on which it was based and therefore lacks even the minimum level of creativity necessary to constitute a copyrightable work. Instead, the defendants contend that the PHPK catalog is a copy of or a derivation of the CVI catalog. The defendants' arguments are not well taken.

> A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work."

17 U.S.C § 101. A plaintiff "cannot succeed on his derivative claim if the Defendants' drawings are not substantially similar to his." *Kohus v. Mariol*, 328 F.3d 848, 858 (6th Cir. 2003).

A comparison of the PHPK and CVI catalogs reveals that the PHPK catalog was not substantially copied from the CVI catalog and does not merely contain "editorial revisions, annotations, elaborations, or other modifications" of the CVI catalog. 17 U.S.C. § 101. Further, the PHPK catalog's layout and substance do not mirror the CVI catalog. Instead, the PHPK catalog has a unique organization and structure that differs from the CVI catalog and contains additional and original articles, text, photographs and organization to make it an original, expressive work. *See also Decker, Inc. v. G&N Equip. Co.*, 438 F. Supp.2d 734, 742 (E.D. Mich. 2006) ("The text used is not essentially the only way to describe the components shown in the

11

catalog. Furthermore, the text used is original, as the words express a minimal degree of creativity."). Thus, the Court finds that the PHPK catalog does not constitute a derivative or a copy of the CVI catalog.

The Court further finds that the material contained in the PHPK catalog is of the type that is copyrightable. As the Sixth Circuit opined in *Whatever it Takes*, "[c]lassification schemes can in principal be creative enough to satisfy the originality requirement of copyright protection." 402 F.3d at 706 (citing *Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 979 (7th Cir. 1997) ("Facts do not supply their own principles of organization. Classification is a creative endeavor. . . . There can be multiple, and equally original, biographies of the same person's life, and multiple original taxonomies of a field of knowledge.")). The arrangement and presentation of illustrations, photographs, and other related materials in the PHPK catalog are creative enough to satisfy the originality requirement and, thus, qualify for copyright protection.

Accordingly, the Court concludes that the PHPK catalog is copyrightable. The next issue then is whether the Eden catalog infringed upon the copyrighted PHPK catalog.

### 2. Infringement

"To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it." *Kohus*, 328 F.3d at 853 (citing *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984)). "In order to prove copying by the defendant, the plaintiff must prove access as well as substantial similarity. 3 Nimmer [on Copyright] at § 13.02. Thus, copying is an essential element of infringement and substantial similarity between the plaintiff's and defendants' works is an essential element of copying." *Wickham*, 739 F.2d at 1097 (citations omitted).

12

In the instant action, the defendants make two arguments as to why they are entitled to summary judgment on the plaintiff's claim that the Eden catalog infringes upon the PHPK copyright. First, they contend that "the specific instances of copying [by the Eden catalog of the PHPK catalog] to which the plaintiff refers do not constitute infringement" because the type of data in the catalog is "not subject to copyright protection." (Def. Summ. Judg. Mot. at 22.) This Court, however, just determined that the type of material contained in the PHPK catalog is the type of material that is copyrightable.

With regard to the defendants' second argument, they contend that, "to the extent the plaintiff is alleging that Eden has infringed only specific portions of the PHPK catalogue, that claim cannot survive summary judgment either" because "certain specific allegations of copying," set forth in the third amended complaint ("complaint") refer to data that is not copyrightable. *Id.* at 22. For example, the defendants posit that the product dimension tables referred to in paragraph 32 of the complaint are not entitled to protection and, the instances of copying set out in paragraph 34 are "either non-creative or non-original." *Id.* at 22-23. The defendants conclude this analysis by stating:

> The point of all this is that the PHPK catalogue in whole and in specific parts is functionally a copy of the CVI catalogue, and as such, the PHPK catalogue lacks the requisite creativity or originality to satisfy the Copyright Act and warrant copyright protection. *See Whatever It Takes*, 402 F.3 at 709 711-12. Moreover, the PHPK catalogue simply provides basic factual information about PHPKs business operation or describes its products and processes. Thus, it is not subject to copyright protection. *See Kohus*, 328 F.3d at 853-5. After eliminating the copied and non-creative elements of the PHPK catalogue, there is nothing left of it to protect. Therefore, even if Eden did imitate aspects of the PHPK catalogue, by doing so Eden did not commit a copyright violation. *See Ross Brovins Oehmke P.C. v. LexisNexis Group*, 463 F.3d 478, 482-83 (6th Cir 2006) ("compilation copyright protection is very limited and usually requires substantial verbatim copying").

13

*Id.* at 25. The defendants' arguments are not well taken.

Again, the Court has already determined that the material in the PHPK catalog possesses the requisite qualities required to permit it to be copyrighted. The next issue before the Court is whether the defendants' copying of the PHPK catalog rendered the Eden catalog substantially similar to the PHPK catalog. *See Wickham*, 739 F.2d at 1097. As to that argument, the defendants do not request that the Court engage in an evaluation of the PHPK and the Eden catalogs to determine if they are substantially similar. Indeed, only twice do the defendants evaluate the similarities or differences between the Eden and the PHPK catalogs, *i.e.*, "the drawings [referred to in paragraph 33 of the complaint] are clearly different" from each other and the titles and headings referred to in paragraph 34(e), (f), and (g) are "substantially different" from the "expressions used in the Eden catalog. (Def. Summ. Judg. Mot. at 23, 24. The plaintiff, however, has made the allegations that the Eden catalog is replete with comprehensive similarities–not just that two sections of the catalog are substantially similar. As to that analysis, the Court has not been asked to engage.

### 3. Conclusion - Copyright Act

Viewing the evidence in the light most favorable to the plaintiff, and drawing all justifiable inferences in its favor, the Court finds that the PHPK catalog is copyrightable and that the issue of whether the Eden catalog infringes upon the PHPK catalog is left for the trier of fact to determine. Accordingly, the Court **DENIES** Defendants' Motion for Summary Judgment as it relates to the plaintiff's claim filed under the Copyright Act.

### B. Ohio Uniform Trade Secrets Act

The plaintiff has filed a claim for misappropriation of trade secrets under the Ohio

14

Uniform Trade Secrets Act, ("Trade Secrets Act"), Ohio Rev. Code § 1333.61 *et seq*.  A widely-cited Northern District of Ohio case directs that to establish a cause of action for misappropriation of trade secrets, a plaintiff must prove by a preponderance of the evidence that (1) a trade secret exists; (2) the trade secret was acquired as a result of a confidential relationship; and (3) the trade secret was acquired as a result of the unauthorized use of the secret.  *Penetone Corp. v. Palchem, Inc.*, 627 F. Supp. 997, 1005 (N.D. Ohio 1985).

The plaintiff argues that its shop drawings, customer lists, and pricing information are trade secrets.  The plaintiff also alleges that the defendants improperly acquired and used these trade secrets, particularly the shop drawings, to build Eden's business by copying them, and using them to produce identical cryogenic products.  The plaintiff alleges that it owns the trade secrets at issue in this case because on March 22, 2004 it purchased Old PHPK's assets, including Old PHPK's intellectual property rights, which include the trade secrets.

The defendants argue that they are entitled to summary judgment on the plaintiff's misappropriation of trade secrets claim because, *inter alia*, it is barred by the applicable statute of limitations.  The Trade Secrets Act includes its own four-year statute of limitations.  Ohio Rev. Code § 1333.66.  It provides that all such claims must be brought within four years from the first date when the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered.  *Id.*  This case was filed on April 24, 2008.

As quoted above, § 1333.61(B) of the Ohio Revised Code provides that misappropriation can be by improper acquisition, disclosure, or use.  Thus, the decisive issue regarding the commencement of the statute of limitations is determination of the time when Old PHPK or PHPK knew or should have reasonably known that Mitchell unlawfully acquired, disclosed, or

15

used its trade secret information.  In determining whether a party should have discovered

wrongful conduct, the relevant inquiry is whether the facts known "would lead a fair and prudent

man, using ordinary care and thoughtfulness, to make further inquiry[.]"  *Hambleton v. R.G.*

*Barry Corp.*, 12 Ohio St.3d 179, 181 (1984).  If the party has such knowledge and fails to make

an inquiry, "he is chargeable with knowledge which by ordinary diligence he would have

acquired."  *Id.*

     In the case *sub judice*, the defendants ague that Old PHPK knew, or should have known,

in 1999, when Mitchell left Old PHPK's employ and took the shop drawings.  It is not disputed

that Hensley, President of Old PHPK, knew that Mitchell took the shop drawings with him in

1999.  The defendants contend that, "armed with such information, a reasonable person who

actually believed the drawings in question were trade secrets would take action to at least to

investigate the situation."  (Doc. 171 at 13) (citing *Adcor Indus. v. Bevcorp, LLC*, 252 Fed. Appx.

55, 62 (6th Cir. 2007) (holding that "rumors [that trade secrets were taken] triggered inquiry

notice under Ohio law [because] the discovery rule requires the owner of a trade secret to

conduct a timely and reasonable *investigation* after learning of possible misappropriation")

(emphasis in original)).

     The plaintiff does not dispute that a high ranking official's knowledge is imputed to the

company; however, it contends that the circumstances present here permit the Court to forego

this imputation.  The plaintiff argues that the only evidence the defendants cite in support of their

claim that Old PHPK knew Mitchell had possession of its shop drawings are the declarations of

Hensley and Mitchell–both defendants in this case.  The plaintiff relies on *Display Research*

*Labs. v. Telegen Corp.*, 133 F. Supp.2d 1170, 1177 (N.D. Cal. 2001) for the proposition that, if

an officer of a company is aware that he intends to steal the company's trade secrets, that

knowledge cannot be imputed to the company and trigger the statute of limitations. The plaintiff

suggests that, in 1999 Hensley and Mitchell planned or had some sort of agreement to permit

Mitchell to steal the shop drawings so that the two could benefit from the theft. Therefore, the

plaintiff concludes, Hensley's knowledge cannot be imputed to Old PHPK.

In their reply brief, the defendants argue that the plaintiff's suggestion that in 1999

Hensley conspired with Mitchell to steal the shop drawings is purely speculative and defies logic:

> Not only does the Plaintiff's story lack evidence, in order for it to have any legs, one
> would have to ignore the following: Hensley terminated Mitchell's relationship with
> Old PHPK in 1999, more than 6 years before either began to work at Eden;
> Mitchell's primary job is, and has been for over 20 years, as a firefighter for the
> Columbus Fire Department, and he worked for Old PHPK only part-time as needed
> as an independent contractor; Mitchell was not a partner with Hensley, and had little
> at stake in the cryogenic industry; after Hensley terminated Mitchell at Old PHPK,
> Mitchell worked part-time as a drafter for Chart, a PHPK competitor, for over 2
> years; Hensley was the president of Old PHPK for another 4 years; Hensley helped
> Coleman in the latter's purchase of Old PHPK; Coleman hired Hensley in March
> 2004 as president of New PHPK, and then fired him later that year because Coleman
> thought he could run the company himself; Hensley was unemployed for nearly a
> year; and finally, Hensley started a company that in 2006 became Brehon Cryogenics,
> a subsidiary of Eden Energy, an Australian company. To suggest in light of these
> facts that there was a grand scheme concocted in 1999 between Mitchell and Hensley
> to misappropriate Old PHPK.s trade secrets is preposterous on its face and falls into
> the *Matsushito* realm of implausibility.

(Def. Reply at 17) (internal citation omitted).

The Court finds the defendants' argument well taken. It would certainly not be

appropriate for the Court to impute Hensley's knowledge to Old PHPK if Hensley did not act on

the knowledge, because he conspired with Mitchell to steal the shop drawings for their benefit.

That is not the situation here, however. There is simply no evidence before the Court othat tends

to show that Mitchell and Hensley conspired to steal trade secrets so as to compete with PHPK.

17

Indeed, the evidence indicates the opposite.  There is no dispute that Hensley knew that Mitchell retained the shop drawings when he terminated Mitchell, yet Hensley did nothing even though Mitchell accepted employment with a competitor of the Old PHPK, where Hensley was President for another four years.  Hensley did nothing with these alleged trade secrets for more than six years–even though he was out of work for almost a year during that time.  The plaintiff's contention that six years before Mitchell made use of the Old PHPK drawings, Hensley conspired to steal those drawings, in light of the evidence before the Court, is simply too speculative to defeat the defendants' motion for summary judgment.  *See Gooden v. City of Memphis Police Dept.*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment."); *see also Matsushita Elec. Indus.*, 475 U.S. at 586-87, 593-94 (holding court not required to accept implausible theory).

Therefore, the Court finds that, even when viewing the evidence in the light most favorable to the plaintiff, and making all justifiable inferences in its favor, Old PHPK knew or should have known that Mitchell misappropriated trade secrets in 1999, approximately 8 years before the plaintiff commenced this action.  Thus, the four-year statute of limitations set forth in Ohio Revised Code § 1333.66 bars the plaintiff's claim filed under the Trade Secrets Act. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as it relates to that claim.

## C.  The Plaintiff's Remaining Claims

The defendants argue that the plaintiff's Trade Practices Act claim, its unfair competition, breach of fiduciary duty/duty of loyalty, and civil conspiracy claims are all preempted by the

18

Ohio's Uniform Trade Practices Act and/or the Copyright Act. The defendants further argue that, to the extent that these remaining claims are not preempted, they are entitled to judgment on them as a matter of law.

As to the defendants' preemption arguments, the Trade Secrets Act indicates that it is intended to displace certain state law claims. *See* Ohio Rev. Code § 1333.67 (statute displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret"). "The test to determine whether [] state law claim[s] [are] displaced by [the Trade Secrets Act] is to determine whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret misappropriation." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 989 (N.D. Ohio 2008) (citing *Glasstech, Inc. v. TGL Tembering Sys., Inc.*, 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999)).

Similarly, § 301 of the Copyright Act provides that "a state common law or statutory claim is preempted if: (1) the work is within the scope of the 'subject matter of copyright,' as specified in 17 U.S.C. §§ 102, 103; and, (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright as set out in 17 U.S.C. § 106." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001). "Courts and commentators have described this preemption analysis as encompassing a 'subject matter requirement' and a 'general scope' or 'equivalency' requirement." *Id.*

### 1. Deceptive Trade Practices Act

The plaintiff alleges a claim under Ohio's Deceptive Trade Practices Act. The parties parse the plaintiff's Deceptive Trade Practices Act claim into portions that involve copying of the

PHPK catalog, false or misleading representations, and confusion in the marketplace. The defendants argue that a portion of the plaintiff's claim is preempted by the Copyright Act, and that the portion of the claim that is not preempted cannot survive summary judgment.

### a. Copyright Act Preemption

The plaintiff's Deceptive Trade Practices Act claim is based in part on the defendants' alleged copying of PHPK's catalog. The defendants argue, and the plaintiff does not dispute, that the portion of the plaintiff's claim based upon the alleged copying of PHPK's catalog is preempted by the Copyright Act. In this regard, the parties are correct. *See Whatever It Takes*, 402 F.3d at 713-4.

### b. The Deceptive Trade Practices Act Claim

The Deceptive Trade Practices Act provides that "[a] person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person," *inter alia*, (1) "[c]auses the likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another;" (2) "[r]epresents that goods or services have sponsorship, approval, characteristics," they do not have; or (3) [r]epresents that goods or services are of a particular standard, quality, or grade" if they are not. Ohio Rev. Code § 4165.02(A)(3), (7), (9). "The Ohio Deceptive Trade Practices Act is substantially similar to section 43(a) of the Lanham Act [15 U.S.C. § 1125(a)] . . . . In fact, an analysis appropriate for a determination of liability under section 43(a) of the Lanham Act is also appropriate for determining liability under the Ohio Deceptive Trade Practices Act." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1431 (S.D. Ohio 1990)

The remaining portions of the plaintiff's Deceptive Trade Practices Act "claim is based

20

upon the defendants' actions of making false representations regarding their products and causing

confusion in the marketplace." (Pl. Opp. Mem. to Def. Summ. Judg. Mot. at 99.)

### i. False and misleading advertisement

To succeed on a claim for false and misleading advertising under the Ohio Deceptive

Trade Practices Act, a plaintiff must show that:

> (1) the defendant has made false or misleading statements of fact concerning his own product or another's; (2) the statement deceives or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff.

*Reed Elsevier, Inc. v. TheLaw.net Corp.*, 269 F. Supp.2d 942, 951 (S.D. Ohio 2003) (citing *Am.*

*Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*,

185 F.3d 606, 613 (6th Cir.1999); *Cesare v. Work*, 36 Ohio App. 3d 26 (Ohio Ct. App. 1987)).

The parties do not dispute that the advertisements at issue were introduced into interstate

commerce.

Regarding the first element, the defendants argue that the plaintiff has produced no

evidence showing that the defendants made any false statement regarding Eden's products. This

Court, however, disagrees. The plaintiff has submitted testimony from Hensley and Richard

Coleman, PHPK's owner, that indicates that Eden had never manufactured or tested products that

it claimed had particular heat leak values and that the Eden catalog indicated had been "tested for

operation in cryogenics service." (Pl. Opp. Mem. to Def. Summ. Judg. Mot. at 104) (quoting

Eden Catalog).  Also, Eden stated in its catalog that it stocked a complete line of standard

components, despite the fact that it is uncontroverted that Eden had not manufactured a number

of the products shown in its catalog.

As to the second, third and fourth elements of the false or misleading advertisement test, the defendants argue that the plaintiff failed to present any testimony that a substantial portion of Eden customers were deceived, that the alleged misstatements would likely influence a customer's purchasing decisions, or that there was a causal link between the challenged statements and the harm to PHPK. The defendants' arguments are not well taken.

The defendants' own expert, David John Roth, testified that material in the heat leak values are an important way that cryogenics companies market their products and distinguish themselves from their competitors. (Roth Dep. at 25, 62, 79-80, 86-87). Certainly, as the plaintiff argues, false representations about the heat leak values of Eden products would deceive PHPK's customers and influence their purchasing decisions, causing harm to PHPK. Indeed, Coleman testified[4] that he was required to demonstrate that PHPK's products were equivalent to Eden's to a customer who had engaged PHPK for a major project because this customer was actually confused by the advertisements in the Eden catalog. (Colman Dep. at 75-79.) Consequently, the Court concludes that the evidence before it "presents a sufficient disagreement

---

[4]The defendants argue that Coleman's testimony is inadmissible because the "customer's purported statement [about being confused] is inadmissible hearsay." (Def. Reply in Supp. of Summ. Judg. Mot. at 45) (citing to Fed. R. Evid. 801(c); *Taylor Bldg. Corp. v. Benfield*, 507 F. Supp. 2d 832, 843-44 (S.D. Ohio 2007)). The Court, however, is not relying upon the customer's statement, but instead relies upon Coleman's testimony as to what he did in satisfying a customer. Coleman's testimony to his own actions and statements is not inadmissible hearsay. If, however, the Court found the statement of the customer relevant, it would be able to rely on it. This is because in Lanham Act cases, "[c]ourts have generally held that testimony regarding statements by customers evidencing confusion are admissible either because they are not hearsay or because they are admissible under Fed. R. Evid. 803(3) to show the declarant's state of mind, *i.e.*, confusion between two trademarks." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 786 (W.D. Mich. 2006) (gathering cases).

to require submission to a jury" as opposed to being "so one-sided that [the defendant] must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251-52).

### ii. Confusion in the marketplace based on false representations

The last portion of the plaintiff's Deceptive Trade Practices Act claim is based on the defendants allegedly causing "confusion or misunderstanding in the marketplace because they falsely represented the characteristics and quality of Eden's products." (Pl. Opp. Mem. to Def. Summ. Judg. Mot. at 101.) The defendants argue that the Deceptive Trade Practices Act does not separately recognize such a violation. The plaintiff does not disagree with the defendants' position.

As the defendants correctly explain in their reply brief, the Deceptive Trade Practices Act prohibits making false representations regarding goods. Ohio Rev. Code § 4165.02(A)(7), (9). It also prohibits causing a likelihood of confusion regarding the source, sponsorship, or approval of goods, as well as affiliation or association with another, *i.e.*, trade dress infringement. *Id.* § 4165.02(A)(2)-(3). The Act, however, has no provision that prohibits causing confusion by making false representations about a company's own product.

Moreover, in the face of the defendants' motion for summary judgment on this claim, the plaintiff does not set forth an analysis under the test for determining whether the Eden catalog created a likelihood of confusion in the marketplace, a claim that is recognized under the Deceptive Trade Practices Act. *See Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville*, Inc., 670 F.2d 642, 648 (6th Cir.1982) (in considering whether there is a "likelihood of confusion," the Court examines the following eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual

23

confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the

defendant in selecting the mark; and (8) likelihood of expansion of the product lines).  The

plaintiff cannot rest on its pleadings, but instead must present evidence showing that there is a

genuine issue for trial.  *Glover v. Speedway Super Am. LLC*, 284 F. Supp.2d 858, 862 (S.D. Ohio

2003).  The Court is not "obligated to wade through and search the entire record for some

specific facts that might support the [plaintiff's confusion in the marketplace] claim." *Id.* (citing

*InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989)).

### c.  Conclusion - Deceptive Trade Practices Act

When viewing the evidence in the light most favorable to the plaintiff, and making all

justifiable inferences in its favor, the Court concludes that there are issues of material fact that

preclude summary judgment on the portion of the plaintiff's Deceptive Trade Practices Act claim

that is based upon the defendants' alleged false and misleading representations.  The Court,

therefore, **DENIES** Defendants' Motion for Summary Judgment as it relates to that portion of

the plaintiff's claim and **GRANTS** the motion as to the remainder of the plaintiff's Deceptive

Trade Practices Act claim based upon the defendants' copying of the PHPK catalog and the

defendants' creating confusion in the marketplace based upon false advertisement of their own

product.

### 2.  Unfair competition

The defendants argue that the plaintiff's common law unfair competition claim is

preempted in part by the Trade Secret Act and in part by the Copyright Act.  This Court agrees.

As set forth *supra*, the Trade Secrets Act preempts claims that are no more than a

restatement of the same operative facts that formed the basis of the plaintiff's statutory claim for

trade secret misappropriation. *See Thermodyn Corp.*, 593 F. Supp. 2d at 989. The plaintiff

argues that its common law unfair competition claim is not preempted by the Trade Secret Act or

the Copyright Act because it is based upon the additional operative facts of (1) the defendants'

use of the "plaintiff's confidential information to save time and cost in getting the defendant's

competing business up and running," and (2) that the defendants' trademark infringement caused

confusion in the marketplace. (Pl. Opp. Mem. to Def. Summ. Judg. Mot. at 96-99.)

    As to the plaintiff's first contention, the defendants correctly explain that the allegation

that the use of confidential information allowed the defendants to save time and cost does not

alter the nature of the plaintiff's unfair competition claim. That is, irrespective of the defendants'

alleged unjust benefit, the unfair competition claim is still based on the misappropriation of

confidential information. Consequently, the plaintiff's contention here does not save the portion

of its unfair competition claim based upon misappropriation of trade secrets from preemption by

the Trade Secrets Act.

    With regard to the plaintiff's second assertion, that the defendants created confusion in

the marketplace by copying the PHPK catalog, the defendants argue that it is preempted by the

Copyright Act. The plaintiff does not disagree with this argument and the Court finds that it is

correct. That is, the PHPK catalog is a work that is within the scope of the subject matter of its

copyright and the rights granted under Ohio's unfair competition law is equivalent to the rights

available under the Copryright Act. *See Wrench LLC v. Taco Bell Corp.*, 256 F.3d at 453; 17

U.S.C. §§ 102, 103, 106. That aspect of the plaintiff's unfair competition claim is therefore

preempted by the Copyright Act. Consequently, the plaintiff's entire common law unfair

competition claim is properly preempted.

25

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on the plaintiff's common law unfair competition claim.

### 3. Breach of fiduciary duty/breach of duty of loyalty

The plaintiff contends that Hensley, as the President of PHPK owed a duty of disclosure to the company, and a duty to enforce the policies of the company. The plaintiff argues that its breach of duty claims against Hensley are based on different acts of misconduct than the misappropriation of trade secrets. These different acts of misconduct include: "Hensley never informed the owners of Old PHPK or PHPK that he had authorized Mitchell to have a secret, undisclosed interest in PHPK's shop drawings that was contrary to the express representations made in the drawings that the drawings were the sole property of PHPK, and, in failing to inform the owners of PHPK that he had done so, violated his duty of loyalty and disclosure to PHPK." (Pl. Opp. Mem. to Def. Summ. Judg. Mot. at 97-98.)

The defendants argue, *inter alia*, that the Ohio Trade Secrets Act preempts the plaintiff's breach of duty of loyalty claim against Hensley because the claim is based on the use and disclosure of alleged trade secrets. Specifically, the defendants assert that the claim that Hensley allowed Mitchell to secretly harbor PHPK's trade secret information is merely a reiteration of the facts upon which the plaintiff's misappropriation of trade secrets claim is based. This Court agrees.

The factual allegations the plaintiff makes in support of its misappropriation of trade secrets claim are that Hensley permitted Mitchell to improperly retain the shop drawings. The plaintiff similarly claims that Hensley breached his fiduciary duty of loyalty to PHPK by allowing Mitchell to improperly retain the shop drawings. *See Allied Erecting & Dismantling*

26

*Co. v. Genesis Equip. & Mfg.*, 649 F. Supp. 2d 702, 723-24 (N.D. Ohio 2009) (finding preemption under similar circumstances).  Therefore, the Court finds that the plaintiff's breach of fiduciary duty/breach of the duty of loyalty claims are preempted by the Copyright Act. Consequently, the Court **GRANTS** Defendants' Motion for Summary Judgment on those claims.

### 4.  Civil conspiracy

The plaintiff argues that, "[b]ecause PHPK's unfair competition and breach of fiduciary duty/duty of loyalty claims are not preempted" its "civil conspiracy claim is also not preempted." (Pl. Opp. Mem. to Def. Summ. Judg. Mot. at 98) (citing *Eisenberg v. Anheuser-Busch, Inc.*, No. 10:04cv1081, 2006 U.S. Dist. LEXIS 4058, at *28, n.6 (N.D. Ohio Feb. 1, 2006) (holding whether a civil conspiracy claim was preempted was dependent upon whether the underlying claims were preempted)).  As the Court just explained *supra*, however, the plaintiff's unfair competition and breach of duty claims are preempted.  Consequently, the plaintiff's civil conspiracy claim suffers the same fate.  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as it relates to the plaintiff's civil conspiracy claim.

### IV.  Plaintiff's Motion for Summary Judgment

The defendants filed counterclaims for defamation, tortious interference with business relationships, and abuse of process.  The plaintiff has moved for summary judgment on all three of these counterclaims.

## A.  Defamation

The defendants base their defamation claim primarily upon the March 2008 letter the plaintiff sent to Eden's customers and potential customers detailing the defendants' claims that Eden infringed upon PHPK's copyright and misappropriated PHPK's trade secrets.  The letter in

27

part reads:

> Such similarities in product lines, coupled with the former employee's access to and possession of proprietary and confidential PHPK drawings, make it clear that Eden's product line is made from proprietary and confidential drawings and specifications misappropriated from PHPK Technologies. The use by Eden of PHPK confidential and proprietary drawings and data without permission is wrongful and in violation of Ohio's Uniform Trade Secrets Act, O.R.C. § 1333.61 *et seq*. We are taking action against Eden to enjoin further use of PHPK's confidential and proprietary information by Eden to produce its equipment and components.

> PHPK is giving notice to all of its customers and potential customers of this activity by Eden in order to prevent purchasers of cryogenic equipment from inadvertently obtaining equipment embodying the misappropriated trade secrets of PHPK.

(Ans. and Counterclaim, Ex. A.) The defendants allege that this letter was sent with the intent to damage Eden's business and reputation in the cryogenics industry.

"Defamation is a 'false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business.'" *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 460 (6th Cir. 2004) (citing *Sweitzer v. Outlet Communs., Inc.*, 133 Ohio App. 3d 102, 108 (Ohio Ct. App. 1999). The plaintiff argues that it is entitled to summary judgment on the defendants' defamation claim because the actions PHPK took were subject to a qualified privilege. The plaintiff disputes also that the defendants can prove their defamation claim, but it does not move for summary judgment on that ground because of the questions of fact that analysis would potentially present. The defendants, however, contend that Ohio law does not treat the plaintiff's alleged defamatory statements as privileged, and that, even if it did, questions of material fact nonetheless preclude summary judgment in the plaintiff's favor.

The essential elements of a privileged communication are:

28

(1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only.

*Taylor Building Corp. of America v. Benfield*, 507 F. Supp. 2d 832, 841 (S.D. Ohio 2007) (citing *Hahn v. Kotten*, 43 Ohio St. 2d 237, 243 (1975)). "A qualified privilege is recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Hahn*, 43 Ohio St. 2d at 244. A qualified privilege does not negate the otherwise actionable quality of the statements made. Rather, it acts to heighten the standard of proof. *A & B-Abell Elevator Co. v. Columbus/Central Ohio Building & Construction Trades Council*, 73 Ohio St. 3d 1, 9 (1995). A defendant otherwise protected by a qualified privilege can be held liable only if it is proven by clear and convincing evidence that he acted with actual malice. *Id.* at 11-12. "A qualified privilege protecting the making of defamatory statements is exceeded when the statements are made with 'actual malice,' that is, with knowledge that the statements are false or with reckless disregard of whether they were false or not." *Hahn*, 43 Ohio St. 2d at syllabus paragraph 2. "Whether a qualified privilege exists is a question of law for the Court so long as material facts are not disputed." *Kelly v. Sulfsted*, No. 1:06-cv-0455, 2008 U.S. Dist. LEXIS 25073, at *18 (citing A *& B-Abell Elevator Co.*, 73 Ohio St. 2d at 7).

The plaintiff first argues that the undisputed evidence establishes that the letter was sent in good faith to protect PHPK's interests that it believed were being impaired by the defendants. (Pl. Summ. Judg. Mot. at 5) (citing Coleman Decl. at ¶ 4) (Coleman avers that he sent the letter in good faith after consulting counsel). The plaintiff also posits that it "sent only approximately 250 letters, all to customers to whom PHPK strongly believed [the defendants]

had sent their catalog and to whom [the defendants] were attempting to sell products." (Pl. Reply in Supp. of Summ. Judg. Mot. at 3) (citing Coleman Decl. at ¶ 2). The defendants, however, contend that there is conflicting evidence in this regard. The defendants rely primarily on their arguments as to why the plaintiff's misappropriation of trade secrets and copyright claims have no merit, which provides little guidance to the Court in the analysis at hand. However, the defendants also rely on the uncontroverted evidence that Eden responded two days after receiving the plaintiff's cease and desist letter, stating that Eden took the allegations very seriously, and promised to promptly conduct a full investigation. (Def. Opp. Mem. to Pl. Summ. Judg. Mot. at 11) (citing Hensley Decl. ¶ 7, Ex. 4).

In the face of the defendants' prompt response and without replying in anyway to it, Coleman sent the letter to Eden's customer's and potential customers less than a week later. The defendants submit evidence that shows that the list of customers and potential customers to which the letter was sent consisted of not 250 companies but rather 1,500 companies. While the defendants did not present evidence that each and every one of the 1,500 letters was actually sent, the evidence before the Court, when viewed in the light most favorable to the defendants, casts doubt on the good faith intentions of Coleman. A reasonable trier of fact could infer that Coleman did not send the letter in good faith, but instead did so to damage Eden's business and reputation in the cryogenics industry. Consequently, the defendants have raised genuine issues of material fact that prohibits summary judgment on this claim. The Court, therefore, need not consider the plaintiff's additional reasons that it believes it is entitled to summary judgment on this claim. Accordingly, the Court **DENIES** Plaintiff's Motion for Summary Judgment as it relates to the defendants defamation counterclaim.

**B. Tortious Interference with Business Relationships**

"Under Ohio law, '[t]he tort of interference with a business relationship occurs when a

person, without a privilege to do so, induces or otherwise purposely causes a third person not to

enter into or continue a business relationship with another.'" *Harris v. Bornhorst*, 513 F.3d 503,

523 (6th Cir. 2008) (quoting *McConnell v. Hunt Sports Enters.*, 132 Ohio App. 3d 657, 689

(Ohio Ct. App. 1999) (bracket in original)). "'The elements of tortious interference with a

business relationship are (1) a business relationship, (2) the wrongdoer's knowledge thereof, (3)

an intentional interference causing a breach or termination of the relationship, and (4) damages

resulting therefrom.'" *Id.* (quoting *McConnell*, *supra*).

The plaintiff argues that it is entitled to summary judgment on the defendants' tortious

interference counterclaim because, among other things, the defendants have not presented any

admissible evidence establishing they have been damaged as a result of PHPK's alleged tortious

interference. The defendants do not respond to the plaintiff's argument.

The Court finds that the plaintiff has met its burden of informing the Court of the "basis

for its motion, and identifying those portions" of the record which demonstrate "the absence of a

genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The defendants have failed to

"set forth specific facts showing that there is a genuine issue for trial" on this counterclaim.

*Liberty Lobby, Inc.*, 477 U.S. at 250. Thus, the Court **GRANTS** Plaintiff's Motion for Summary

Judgment as it relates to the defendants' tortious interference with business relationships

counterclaim.

**C. Abuse of Process**

In Ohio, "'[t]he three elements of the tort of abuse of process are: (1) that a legal

31

proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process.'" *Voyticky v. Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005) (quoting *Yaklevich v. Kemp, Schaeffer & Rowe Co.*, 68 Ohio St. 3d 294 (1994)). "Under the second element, there is no liability [for abuse of process] where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions." *Hahn v. Star Bank*, 190 F.3d 708, 718 (6th Cir. 1999) (internal quotations omitted and brackets in original) (citing *Yaklevich*, *supra*; William L. Prosser & Page Keeton, The Law of Torts § 121, at 898 (5th ed. 1984)).

In the case *sub judice*, the defendants contend that the plaintiff's "primary purpose in litigating the claims in this case has been to strain Eden's relationships with its costumers and to force Eden to absorb enormous litigation costs, making it difficult for Eden to Survive in the marketplace." (Def. Opp. Mem. at 1, 13) (the plaintiff "adopted a litigation strategy of escalating irrational measures, designed to cripple the defendants financially and thereby impair Eden's ability to carry out its business") The defendants refer to the plaintiff's litigation strategies as "abusive" and posit that they include filing a "tardy motion for a temporary restraining order," the plaintiff's unwillingness to discuss settlement, the plaintiff's "reckless" allegations of theft by Hensley, requiring the defendants to engage in unnecessary discovery, asserting claims that are clearly preempted, and relying on expert opinion that are "wholly unreliable." *Id.* at 14-17. The defendants' arguments are not well taken.

The defendants allegations are properly categorized as complaints about the plaintiff's counsels' litigation strategy. This Court is not in the business of second guessing litigation

strategies of competent attorneys, which include those representing both the plaintiff and the

defendants in this case. The defendants' complaints are ones that could be made by nearly any

litigant that comes before this Court. There is nothing that rises to the level of the type of

improper behavior sufficient to support an abuse of process cause of action. *See e.g., Hildreth*

*Mfg. v. Semco, Inc.*, 151 Ohio App.3d 693, 717-18 (Ohio Ct. App. 2003) (finding the plaintiff

stated a claim upon which relief could be granted by alleging the competitor "threatened to sue

various vendors, potential customers, and sales representatives of Hildreth and contacted law

enforcement with false information of theft by Hildreth's employees"). Accordingly, the Court

**GRANTS** Plaintiff's Motion for Summary Judgment as it relates to that claim.

### VI. Conclusion

For the reasons set forth above, the Court:

1. **GRANTS** Plaintiff's Motion for Leave to File Surreply. (Doc. 172.) The Clerk is

**DIRECTED** to detach Exhibit 1 (Doc. 172-1) from the plaintiff's motion and file it as

"Plaintiff's Surreply."

2. **GRANTS IN PART AND DENIES IN PART** Defendants' Motion for Summary

Judgment. (Doc. 148.) Specifically, the Court **GRANTS** the motion as it relates to the

plaintiff's misappropriation of trade secrets claim filed under Ohio's Uniform Trade Secrets Act,

the plaintiff's Deceptive Trade Practices Act claim based upon confusion in the marketplace and

copying of the PHPK catalog, the plaintiff's common law unfair competition claim, breach of

fiduciary duty/duty of loyalty claim, and civil conspiracy claim. The Court **DENIES** the motion

as it relates to the plaintiff's Deceptive Trade Practices Act claim based upon false or misleading

advertisement and the plaintiff's claims brought under the Copyright Act.

33

3.  **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion for Summary Judgment.  Specifically, the Court **GRANTS** the motion as it relates to the defendants' counterclaims for tortious interference with business relationships and abuse of process and **DENIES** the motion as it relates to the defendants' defamation counterclaim.

    **IT IS SO ORDERED.**


  1-17-2012
**DATE**

Edmund A. Sargus, Jr.
**UNITED STATES DISTRICT JUDGE**

34